**OLMSTED CITIZENS FOR A BETTER COMMUNITY, a nonprofit Minnesota Corporation; Lowell Fredin and Ralph Lindeen, individually, Appellants,**

v.

**UNITED STATES of America, Bureau of Prisons, a bureau of the United States Department of Justice; Norman A. Carlson, Director of the Bureau of Prisons, individually and in his official capacity; Loy S. Hays, Chief, Office of Facilities Development and Operations, Bureau of Prisons, individually and in his official capacity, Appellees.**

No. 85–5141.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1985.

Decided June 9, 1986.

Rehearing and Rehearing En Banc
Denied July 10, 1986.

Arnold, Circuit Judge, dissented and filed opinion.

Robert Abdalian, Minneapolis, Minn., for appellant.

Claire McGuire, Washington, D.C., for appellee.

Before ARNOLD and WOLLMAN, Circuit Judges, and GUNN,* District Judge.

WOLLMAN, Circuit Judge.

Olmsted Citizens for a Better Community and the individual plaintiffs appeal the grant of summary judgment against them on their claims under the National Environmental Policy Act (NEPA). *See* 42 U.S.C. §§ 4321–4347 (1982). The district court [1] held that the government was not required to file an environmental impact statement in connection with the conversion of a former state mental hospital into a federal prisons hospital and that the document filed by the government adequately justified the lack of need for a complete environmental statement. *Olmsted Citizens for a Better Community v. United States,* 606 F.Supp. 964 (D.Minn.1985).[2] We affirm.

The property at issue in this case is a 160-acre wooded campus bordering a neighborhood of family homes and an area of undeveloped land in the city of Rochester, Olmsted County, Minnesota. This campus was established in the late 1800s as a state mental hospital and in addition, for a number of years, provided medical treatment for a small percentage of state prisoners. The hospital was closed and the land deeded to the county in 1982. Even while the hospital had been operating, however, the campus apparently had been "open"—that

---

* The HONORABLE GEORGE F. GUNN, JR., United States District Judge for the Eastern District of Missouri, sitting by designation.

1. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

2. Because we agree with the district court on these points, we need not reach its alternate holding that the document prepared met the standards for an environmental impact statement anyway. 606 F.Supp. at 974. Also, Olmsted Citizens does not challenge on appeal the grant of summary judgment against it on its non-NEPA claims.

is, used by the public for recreational activities.

In April 1983, the U.S. Bureau of Prisons began considering the acquisition of 64 acres of the campus for use as a federal prisons hospital. A document denominated as a "draft environmental impact statement" was circulated in November 1983; and following a review of the public comments received, a final "environmental impact statement" was published in February 1984. After another period for comment, the director of the Bureau of Prisons issued a "record of decision," and congressional approval for the project was obtained. The purchase of the county facility was finalized on May 1, 1984. Within the month Olmsted Citizens for a Better Community, a nonprofit corporation composed of Olmsted County property owners, taxpayers, and registered voters, joined by Lowell Fredin and Ralph Lindeen, two individuals residing in the area of the proposed hospital (hereinafter collectively referred to as "Olmsted Citizens"), filed suit challenging the adequacy of the government's consideration of environmental factors.[3]

## I.

The National Environmental Policy Act, while embodying substantive goals for the preservation of our physical environment, imposes basically procedural obligations in pursuit of these goals. *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980) (per curiam). Federal decisionmakers are required at the formative stages of planning to be fully informed about and make well-reasoned judgments regarding the environmental effects of their proposed actions. *Id.; Kleppe v. Sierra Club,* 427 U.S. 390, 409, 96 S.Ct. 2718, 2729, 49 L.Ed.2d 576 (1976). Such consideration is assured through the development of detailed statements, which have come to

be known as "environmental impact statements," in connection with all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An environmental impact statement need not be prepared if the federal action will have no significant environmental impact, and the burden is on the challenger to raise a substantial environmental issue based on facts which were omitted from consideration in the administrative record. *Winnebago Tribe v. Ray,* 621 F.2d 269, 271 (8th Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980). Even once such a showing has been made, the negative determination on environmental impact will be upheld if the agency can support the reasonableness of its decision. *Id.; Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314, 1320 (8th Cir.1974) (en banc).

The majority of the alleged substantial environmental impacts asserted by Olmsted Citizens can be disposed of on the basis of the recent Supreme Court decision in *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983). The plaintiffs in *Metropolitan Edison* challenged the resumed operation of one of the nuclear power plants at Three Mile Island after a second plant there had malfunctioned, causing widespread concern but no dangerous release of radiation. The plaintiffs contended that the NEPA required the Nuclear Regulatory Commission before permitting reactivation to consider the threat to area residents' psychological health from fears of a nuclear accident.

The Supreme Court, however, stressed that the NEPA was not a vehicle for the airing of general policy objections to federal action but was addressed to the end of protecting human health and welfare only through the means of protecting the physical environment. *Id.* at 772–74, 777, 103 S.Ct. at 1560–61, 1562. The NEPA legislative history, the Court observed, showed a

---

**3.** A motion for a preliminary injunction was denied on the ground that, since the proposed modifications to the campus for the federal prison could be removed, Olmsted Citizens had failed to show irreparable harm. *Olmsted Citizens for a Better Community v. United States,* Civil No. 4–84–492 (D.Minn. July 27, 1984).

primary concern with potential irreparable damage to the physical resources that support life—i.e., air, land, and water, *id.* at 772–73, 103 S.Ct. at 1560—suggesting thus that the only harms as to which agency consideration was meant to be required were those harms following closely from changes in the physical environment. *Id.* at 773–74, 103 S.Ct. at 1560–61. Applying that conclusion to the case before it, the Court held that while the risk associated with advancing technology was an important policy consideration, the fear arising from the "risk" of a nuclear accident (in contrast to the impact on the environment should such an accident occur) was not an effect caused by a change in the physical environment as necessary to force consideration under the NEPA. *Id.* at 775–76, 103 S.Ct. at 1561–62.

▮▮▮ Olmsted Citizens alleges that the effects of converting part of the mental hospital campus into a federal prisons hospital will include the introduction of weapons and drugs into the area, an increase in crime, and a decrease or halt in neighborhood development. These impacts, however, follow not from any physical changes connected with the conversion but from the social changes reflected in the nature of the use of the facility and in the types of

people that will be present. Even before *Metropolitan Edison* this court had held that a project's potential for contribution to criminal activity and alteration of the character of a neighborhood would not require development of an environmental impact statement. *Como-Falcon Community Coalition v. United States Department of Labor,* 609 F.2d 342 (8th Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980).[4] Similarly, other courts also distinguish urban environmental concerns—such as increased congestion, noise, or odors—from the mere dislike or fear of a certain socioeconomic class of persons or the alteration of the nature or amount of commercial activity in the area.[5] While there is no "bright line" between the "physical" and the "socioeconomic" in the urban context, an impact statement generally should be necessary only when the federal action poses a threat to the physical resources of the area because of anticipated traffic, population-concentration or water-supply problems or involves the irreversible alteration of a rare site. *Azzolina v. United States Postal Service,* 602 F.Supp. 859, 862 (D.N.J.1985); *see Breckinridge v. Rumsfeld,* 537 F.2d 864, 865 (6th Cir.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *Citizens*

---

**4.** We observe that Olmsted Citizens, in support of its argument that effects on area development can require preparation of an environmental impact statement, cites the district court opinion in *Como-Falcon,* 465 F.Supp. 850 (D.Minn. 1978), without reference to the subsequent disposition of that case by this court. Olmsted Citizens does note in its table of authorities that *Como-Falcon,* has been "affirmed on other grounds." This court in *Como-Falcon,* however, specifically stated that it was *vacating* a portion of the district court opinion and *modifying* the judgment because the social and economic concerns therein addressed were not encompassed within the provisions of the NEPA. 609 F.2d at 345, 346. As one of our brethren in Ohio has observed, "It would be difficult to formulate a more explicit rejection of [a] District Court's conclusions" than found in *Como-Falcon. Citizens Comm. Against Interstate Route 675 v. Lewis,* 542 F.Supp. 496, 536 (S.D.Ohio 1982).

We note also that Olmsted Citizens, in support of its argument that potential increases in criminal activity require the filing of an environmental impact statement, cites the Second Circuit

decision in *Hanly v. Mitchell,* 460 F.2d 640 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed. 256 (1972)—without mentioning this court's contrary holding in *Como-Falcon.*

**5.** *E.g., Goodman Group, Inc. v. Dishroom,* 679 F.2d 182, 186 (9th Cir.1982) ("dubious proposition" that, when only interior of building was to be refurbished, anticipated change in building residents from artists to low-income persons constituted an environmental effect requiring preparation of an impact statement); *Image of Greater San Antonio v. Brown,* 570 F.2d 517, 522 (5th Cir.1978) (impact on town from reduction of civilian workforce at military base did not trigger requirement of preparation of environmental impact statement); *Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv.,* 487 F.2d 1029, 1037 (D.C.Cir. 1973) (no preliminary injunction when failure to file environmental impact statement was challenged on the basis that construction of a bulk mail facility on a given site would decrease the property tax base in the area and cause an influx of low-income workers).

*Committee Against Interstate Route 675 v. Lewis,* 542 F.Supp. 496, 533–34 (S.D.Ohio 1982).

Olmsted Citizens attempts to distinguish *Como-Falcon* and similar cases on the basis of an oft-quoted passage stating that socioeconomic effects are to be considered in an environmental statement when the federal action at issue also has a primary impact on the natural environment. 609 F.2d at 345 (quoting *Image of Greater San Antonio v. Brown,* 570 F.2d 517, 522 (5th Cir.1978). Such an impact, Olmsted Citizens argues, was absent in *Como-Falcon* but is present with the conversion of the mental hospital to a prisons hospital. We reject this argument for two reasons.

First, it is unlikely that such a distinction survives the recent Supreme Court holding in *Metropolitan Edison.* That decision, as discussed above, was based on congressional intent, and there is no suggestion that Congress contemplated that the process it designed to make agencies aware of the consequences of their actions with regard to the physical environment would be converted into a process for airing general policy objections anytime the physical environment was implicated. Such a rule would divert agency resources away from the primary statutory goal of protecting the physical environment and natural resources, just as in *Metropolitan Edison.* *See* 460 U.S. at 776, 103 S.Ct. at 1562. Furthermore, courts even before *Metropolitan Edison* had commented on the anomaly of requiring that an agency consider impacts not sufficient to trigger preparation of an ecological statement just because such a statement was required for other unrelated reasons. *E.g., Citizens Committee Against Interstate Route 675 v. Lewis,* 542 F.Supp. 496, 534 (S.D.Ohio 1982). Olmsted Citizens' concerns with crime and property values would exist regardless of any physical changes to the former mental hospital campus.

■ Second, we are not convinced that Olmsted Citizens has identified any significant impacts on the physical environment in this case. The physical changes without dispute are the additions of harsh lighting, a double perimeter security fence with barbed wire, and a one-lane perimeter security road to be traversed by an armed mobile patrol. The main impact alleged from these changes, however, is apparently aesthetic, and the Seventh Circuit has suggested that aesthetic concerns alone should rarely be sufficient to compel preparation of an environmental impact statement: "Aesthetic values do not lend themselves to measurement or elaborate analysis. * * * The necessary judgments are inherently subjective and normally can be made as reliably on the basis of an environmental assessment as on the basis of a much lengthier and costlier environmental impact statement." *River Road Alliance, Inc., v. Corps of Engineers of the U.S. Army,* 764 F.2d 445, 451 (7th Cir.1985) (citation omitted), *cert. denied,* —— U.S. ——, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986).

■ We find no special aesthetic concerns here. While the setting for the prisons hospital is a wooded campus rather than an urban city block or industrial zone, *see Maryland-National Capital Park & Planning Commission v. United States Postal Service,* 487 F.2d 1029, 1038 n. 5 (D.C.Cir.1973), neither is it a pristine wilderness area far from civilization. *River Road,* 764 F.2d at 451. The acreage is merely part of a community park, with no evidence that it contains unique, rare, or even unusual natural features, *James v. Tennessee Valley Authority,* 538 F.Supp. 704, 708 (E.D.Tenn.1982), or that it serves as a special scenic (as compared to recreational) attraction. *Maryland-National,* 487 F.2d at 1038 n. 5. Furthermore, the Bureau of Prisons' plans called for the establishment of a natural landscape buffer zone between the campus and the nearest area of homes, and such efforts at minimization of aesthetic impact are entitled to weight in upholding determinations not to file environmental impact state-

ments. *E.g., id.* at 1039; *James,* 538 F.Supp. at 708.[6]

The conversion of the former mental hospital into a prisons hospital will have a further physical impact in that 64 acres will no longer be available for community recreational use. This diminution, however, leaves nearly 100 acres of the original campus open to the public. There is no suggestion of a threat to any endangered species—or to any wildlife at all—and there is no suggestion of any permanent damage to the natural characteristics of the site. *River Road,* 764 F.2d at 452; *James,* 538 F.Supp. at 708.

■ Finally, Olmsted Citizens argues that an environmental impact statement should have been prepared because use of the campus as a prisons hospital violates local zoning ordinances. In cases involving such conflicts, Olmsted Citizens asserts, "more careful scrutiny" of the federal action is required under *Maryland-National,* 487 F.2d at 1037. The language on which Olmsted Citizens relies, however, speaks only of a scrutiny more careful than the *presumption* of no significant impact deemed appropriate in areas such as, for

example, population density, when the federal action does conform to local zoning laws. *Id.* at 1036–37. The court in *Maryland-National* two paragraphs later emphasizes, "Not all deviations from local zoning will necessarily rise to the level of affecting the 'quality of the human environment' within the fair meaning of that term." *Id.* at 1037. In other words, to the degree that a given zoning ordinance reflects social and economic, rather than ecological, considerations, uses contrary to the ordinance do not implicate the concerns underlying the NEPA. *Cf. Town of Groton v. Laird,* 353 F.Supp. 344, 350 (D.Conn. 1972) (The NEPA is not a "metazoning law * * * designed to enshrine existing zoning regulations on the theory that their violation presents a threat to environmental values").[7] Olmsted Citizens' claim of a zoning violation adds nothing beyond the allegations already considered.

■ We conclude that Olmsted Citizens has failed to raise a significant environmental issue within the meaning of the relevant legislation[8] and that there is thus no issue

---

6. Olmsted Citizens, relying on Justice Brennan's concurrence in *Metropolitan Edison,* 460 U.S. at 779, 103 S.Ct. at 1563, argues that an environmental impact statement is still required here because area residents might experience psychological injuries, leading to impacts on health, as a result of the sensory impact of the lighting and perimeter fencing. Even the wording of Olmsted Citizens' brief, however, illustrates that any psychological impact will come not as much from the sensory impact of the physical changes per se as from the knowledge that the changes are associated with a prison and from the distaste for having the prison nearby. Those are exactly the types of concerns, as we developed earlier, which are not cognizable under the NEPA.

7. The federal regulation cited by Olmsted Citizens, 40 C.F.R. § 1508.27(b)(10) (1985), is not to the contrary. It says only that a federal action may be deemed significant when it threatens violation of a local law or regulation "imposed for the protection of the environment," not that a federal action may be deemed significant every time it violates a zoning law. Similarly, any possible violation by the government of statutory provisions regarding federal acquisition of urban properties, *see* 40 U.S.C. §§ 531–533 (1982), is a separate concern not cognizable under the NEPA.

8. Olmsted Citizens in its brief identifies two additional "environmental impacts" not discussed in the body of this opinion. First, it suggests that the prisons hospital might some day have to be evacuated due to its location in a 100-year flood area. This court, however, has questioned whether the NEPA requires consideration of the effects of the environment on the persons who will be using the federal facility. *Monarch Chem. Works v. Thone,* 604 F.2d 1083, 1089 (8th Cir.1979). Second, Olmsted Citizens twice refers in a conclusory fashion to alleged impacts on the community from changed traffic patterns, but the environmental statement prepared by the government discusses traffic routes and parking in greater detail than Olmsted Citizens. To the degree that the concerns raised by Olmsted Citizens were expressly considered by the government (as was the flooding issue also, as well as most of the aesthetic and nonenvironmental issues), Olmsted Citizens' claim challenges not so much the procedural adequacy of the government's consideration of environmental effects as the "correctness" of the government's decision to locate the prisons hospital on the former mental hospital campus. It is not the role of courts to exercise that nature of oversight with regard to agency decisionmaking. *Strycker,* 444 U.S. at 227–28, 100 S.Ct. at 499–500.

of fact preventing a summary judgment that an environmental impact statement was not required for the prisons hospital conversion project.[9]

## II.

Olmsted Citizens further argues that regardless of the question surrounding the impact statement, the government failed to fulfill its independent statutory duty to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Particularly, Olmsted Citizens asserts that the government did not "'explicate fully its course of inquiry, its analysis and its reasoning'" under *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 351 (8th Cir.1972) (quoting *Ely v. Velde*, 451 F.2d 1130, 1139 (4th Cir.1971)), because it did not state why possible alternate sites for the prisons hospital were dismissed as unsuitable or document its conclusion that the mental hospital campus conversion would save $15 million over construction of a new facility.

The "explicate fully" language of *Froehlke* on which Olmsted Citizens relies, however, addresses the sufficiency of and detail needed in a formal environmental impact statement. *See* 473 F.2d at 350–51. The "supplemental" and "more extensive" command of section 4332(2)(E) which Olmsted Citizens draws from *Environmental Defense Fund, Inc. v. Corps of Engineers of the U.S. Army*, 492 F.2d 1123, 1135 (5th Cir.1974), imposes not a duty to publish an even more thorough explanation than in an impact statement but instead a duty to actively seek out and develop alternatives as opposed to merely writing out options that reasonable speculation suggests might exist. *Id.* at 1134–35. The case proposes, for example, that an agency should consider "shelving the entire project" or "accomplishing the same result by entirely different means," *id.* at 1135; the government here correspondingly considered taking no action and contracting for medical care for federal prisoners at state and county facilities.

■ Furthermore, we agree with those circuits which reason that the range of alternatives that reasonably must be considered decreases as the environmental impact of the proposed action becomes less and less substantial. *E.g., River Road Alliance, Inc. v. Corps of Engineers of the U.S. Army*, 764 F.2d 445, 452 (7th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986); *City of New York v. United States Department of Transportation*, 715 F.2d 732, 744 (2d Cir. 1983), *cert. denied,* 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984). As the Second Circuit has stated, it is "something of an anomaly" to require that an agency search for more environmentally sound alternatives to a project which it has determined, through its decision not to file an impact statement, will have no significant environmental effects anyway. *Id.; cf. Hanly v. Kleindienst*, 471 F.2d 823, 837 (2d Cir. 1972) (Friendly, C.J., dissenting) (warning of danger of requiring procedures nearly

---

9. We are not precluded from basing our decision on this ground, as Olmsted Citizens argues, by the rule of *Securities & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). *Chenery* involved the exercise of judgment committed solely to an administrative agency and such agency's reliance, when challenged in litigation, on after-the-fact rationales it did not actually consider in reaching its decision. *Id.* at 196, 67 S.Ct. at 1577. Here, in contrast, we are concerned mainly with the proper interpretation of a statute. *See North Carolina Comm'n of Indian Affairs v. United States Dept. of Labor*, 725 F.2d 238, 240 (4th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct.

112, 83 L.Ed.2d 55 (1984). A belief by the Bureau of Prisons that the NEPA required preparation of an environmental impact statement does not foreclose judicial consideration of the nature of environmental impacts encompassed by that legislation. Furthermore, we observe that the government's preparation here of a putative environmental impact statement means that environmental factors were given even greater consideration, and that Olmsted Citizens was given an even greater chance to participate, than required by the NEPA. The procedural goals of that statute, *see* discussion *supra*, clearly have been met.

as burdensome as with impact statement despite insignificance of environmental effects), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

 Finally, the government was only required to consider reasonable alternatives to conversion of the former mental hospital; it was not required to study remote and speculative possibilities. *Miller v. United States,* 654 F.2d 513, 514 (8th Cir.1981) (per curiam); *cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978) ("To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility."). As a corollary to this principle, Olmsted Citizens to succeed on its claim must make some showing that feasible alternatives exist.[10] *Cf. Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency,* 684 F.2d 1041, 1047 (1st Cir.1982) ("In order to preserve an alternatives issue for review, it is not enough simply to make a facially plausible suggestion; rather, an intervenor must offer tangible evidence that an alternative site might offer 'a substantial measure of superiority' as a site."). Absent such a showing Olmsted Citizens asks this court to presume that an adequate alternate site exists somewhere and that the government did not try hard enough to find this site or to adapt other sites it did consider to the desired use. To the contrary, any lack of specificity by the government regarding alternate sites could mean that all such sites were so inadequate as to be "remote" or "speculative" within the meaning of our cases. A court by requiring an agency to detail the infeasibility of alternatives on the basis of a challenge no more concrete than that made by Olmsted Citizens would risk trivializing the environmental inquiry in the very way the rule of our cases seeks to prevent.

The lack of specificity in Olmsted Citizens' objections further disposes of its claim that the government failed to weigh environmental concerns equally with economic considerations in that it did not study alternatives, such as construction of a new facility, that would have cost more than conversion of the former mental hospital. Since we cannot accept the invitation to presume that the government's figures were incorrect, Olmsted Citizens in effect seeks to require, contrary to *Strycker,* 444 U.S. at 227–28, 100 S.Ct. at 499–500, that environmental concerns be given greater weight than other factors. The government calculated a replacement cost of nearly $36 million for the mental hospital facility and found that it would save in excess of $15 million by selecting the conversion option; given that the opposing environmental concerns, as developed *supra,* are not even sufficient to require an impact statement, it is hard to imagine how any further lessening of environmental impact could justify such an economic cost. The socioeconomic impacts not fairly traceable to the physical changes cannot enter into this balance, either, as section 4332(2)(E) can no more be made into a general vehicle to ensure "good decisions" by government bodies than can the NEPA as a whole.

In sum, Olmsted Citizens' main complaint is that a federal prisons hospital should not be placed in a family neighborhood. Olmsted Citizens diligently pursued opportunities for making its views heard through the local political process, *see Metropolitan Edison,* 444 U.S. at 777, 103 S.Ct. at 1562— voting 78 percent against the project in a nonbinding referendum and showing up 2,000 strong at a public meeting—yet it was not able to dissuade Olmsted County from selling part of the former mental hospital campus to the government expressly for the prisons hospital. Absent a significant question whether the gains from this project will be "worth a given

**10.** The authority relied on by Olmsted Citizens, *Natural Resources Defense Council, Inc. v. Administrator,* 451 F.Supp. 1245 (D.D.C.1978), *modified,* 606 F.2d 1261 (D.C.Cir.1979), is not to

the contrary. The district court in that case emphasized—even to the point of using italics— the specificity of the alternatives proposed by the complainants. *Id.* at 1262.

level of alteration of our physical environment or depletion of our natural resources," *id.* at 776, 103 S.Ct. at 1562, a federal court, through the NEPA, is not the proper forum for Olmsted Citizens to continue the local political dispute.

The summary judgment is affirmed.

ARNOLD, Circuit Judge, dissenting.

I think this case should be tried. Tens of millions of federal dollars are to be or have been spent, and I do not understand the Court's opinion to contend that this is not a "major Federal action [ ]." The question, rather, is whether the action is one "significantly affecting the quality of the human environment...." In giving content to the term "significant," we should heed the direction of Congress that the requirement of preparation of environmental impact statements should be enforced "to the fullest extent possible...." 42 U.S.C. § 4332. That is, in close cases, it is better to err on the side of requiring the preparation of an EIS than on the side of omitting it. "[T]he spirit of the Act would die aborning if a facile, ex parte decision that the project was minor or did not significantly affect the environment were too well shielded from impartial review." *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466 (5th Cir.1973).

Here, because the case was disposed of on summary judgment, we must accept the position of plaintiffs as to all disputed questions of fact, and, in addition, give them the benefit of all reasonable inferences from evidence favoring their side of the case. When this standard is applied, I cannot say that the effect of this project is so clearly insignificant as to justify deciding the case without a trial. The fact that the Bureau of Prisons itself apparently agreed—because it did prepare a document which it described as an EIS—confirms me in this view.

In this Circuit, decisions by agencies that preparation of an EIS is unnecessary—the position this agency now takes—are subject to fairly broad judicial review. Such decisions are to be accepted only if "rea-

sonable." By contrast, in some other circuits a decision that an EIS is not required can be set aside only if the reviewing court is convinced that it is arbitrary and capricious. See *River Road Alliance, Inc. v. Corps of Engineers,* —— U.S. ——, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986) (White, J., dissenting from the denial of certiorari); *Gee v. Boyd,* —— U.S. ——, 105 S.Ct. 2123, 85 L.Ed.2d 487 (1985) (White, J., dissenting from the denial of certiorari). When the standard adopted by this Circuit is applied, the question becomes whether the Bureau of Prisons' present position is so clearly "reasonable" as to eliminate the need for a trial of the case. Because I believe this rather difficult standard has not been met, I respectfully dissent.