866 F.2d 1025
 28 ERC 1902, 19 Envtl. L. Rep. 20,588
 MISSOURI COALITION FOR THE ENVIRONMENT, a corporation;
League of Women Voters of St. Louis County, a corporation;
League of Women Voters of St. Louis, a corporation; The
Open Space Council for the St. Louis Region, a corporation;
Lee Streett; Martin E. Gardner, Jr.; Cornelius Alwood;
Donald F. Weiler; Stanley J. Adams; and Beverly Toner, Appellants,
v.
CORPS OF ENGINEERS OF the UNITED STATES ARMY; John O.
Marsh, Jr., Secretary of the Army; Robert K. Dawson,
Assistant Secretary of the Army for Civil Works; Lt. Gen.
E.R. Heiberg, III, Chief of Engineers; Col. John H.
Atkinson, III, District Engineer of the Kansas City
District, Corps of Engineers; Sverdrup Corporation, a
corporation; Riverport, Inc., a corporation; and Riverport
Associates, a limited partnership, Appellees.
 No. 88-1382.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 14, 1988.
Decided Jan. 27, 1989.
Rehearing and Rehearing En Banc Denied March 17, 1989.
 
 Lewis C. Green, St. Louis, Mo., for appellants.
 Maxine I. Lipeles, St. Louis, Mo., for non-federal appellees.
 Maria A. Iizuka, Washington, D.C., for federal appellees.
 Before FAGG and WOLLMAN, Circuit Judges, and WOODS,* District Judge.
 HENRY WOODS, District Judge.
 The Missouri Coalition for the Environment, the individual plaintiffs and the organizational plaintiffs, collectively referred to herein as the "Coalition," appeal from a final judgment of the district court[1] upholding defendant United States Army Corps of Engineers' decision not to revoke, suspend or modify a permit issued to the non-government defendants under Section 404 of the Clean Water Act of 1977 (Federal Water Pollution Control Act Amendments of 1972), 33 U.S.C. Sec. 1344, which authorized the discharge of dredged or fill material into a wetland area. The district court rejected the Coalition's challenges brought under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Sec. 4321 et seq., and under various other environmental statutes and regulations, finding that the decision of the Corps was not arbitrary, capricious, unreasonable or otherwise not in accordance with law. We affirm.
 BACKGROUND
 Because the district court's exhaustive findings of fact and conclusions of law are reported in Missouri Coalition for the Environment, et al. v. Corps of Engineers of the United States Army, et al., 678 F.Supp. 790 (E.D.Mo.1988), the relevant facts need not be restated in great detail here. In 1983 defendants Riverport Associates, a limited partnership, Riverport, Inc., its general partner, and Sverdrup Corporation, a developer, proposed to construct a commercial-retail-industrial park of a nonspecific nature to be known as "Riverport." The Riverport site is located within a 22,000 acre floodplain north of the City of St. Louis, Missouri near the junction of the Missouri and Mississippi Rivers. The floodplain, commonly referred to as the Missouri River Bottoms, presently contains various agricultural and wetland areas. Originally the Riverport plans included construction of a 4,100-foot levee to protect the development from a 500-year flood--an 800-foot section of which was to be built across a wetland area. And since construction of this 800-foot section involved the discharge of fill material into a wetland, Riverport Associates was required to apply to the Corps for a Section 404 permit.[2] With the exception of this permit requirement, there was no other federal involvement with the project.
 In considering the permit application, the Corps initially conducted an evaluation and environmental assessment (EA) of the proposed Riverport development. The EA concluded with a finding that construction of the levee could have no significant effect on the quality of the human environment.[3] Based on this finding, the Corps' District Engineer determined that the permit could properly be issued without first preparing an Environmental Impact Statement (EIS).[4] The Section 404 permit was thus issued by the Corps on May 16, 1985.
 In November, 1985 defendant St. Louis County, wherein Riverport is located, announced its intention to purchase 100 acres within Riverport. The purpose of this acquisition was to allow St. Louis County to substitute a domed football stadium for certain of the originally planned retail, commercial and industrial facilities. In accord with its intention, St. Louis County asked the Corps to reevaluate the issuance of its Section 404 permit to determine whether the substitution would require the permit to be revoked, suspended or modified under the Corps' regulations.[5] Acting on this request the Corps solicited evidence and opinions from the parties, private organizations, individual experts, local government officials, state agencies and federal agencies as to what effects the proposed stadium would have on the environment. The reevaluation process consumed a total of sixteen months and generated an administrative record weighing 66 pounds. There was testimony that this was the most comprehensive reevaluation undertaken by the Kansas City District in at least the last ten years.
 On June 22, 1987 a "Memorandum For Record" (MFR) was issued to record the results of the District Engineer's reevaluation. As stated in the MFR, if the District Engineer determined that there was a significant increase in the scope of the permitted activity, the changed circumstances and conditions would require that a new permit application be processed.[6] But if there was no significant increase, then the reevaluation would be limited to the question of whether modification, revocation or suspension of the permit was required given considerations of the public interest.[7] The MFR indicates that the District Engineer found, first, that the addition of a stadium to Riverport did not significantly increase the scope of the permitted activity, which was filling of wetlands; and, second, that the potential impacts of the revised project were substantially similar to those evaluated prior to issuance of the original permit. Based on these findings, he then concluded that the changed circumstances did not require that the permit be modified, suspended or revoked. It is this decision which permitted St. Louis County to proceed with its plan to construct a domed stadium.
 In response the Coalition filed this action in the district court on July 30, 1987 seeking declaratory and injunctive relief which would, if granted, prevent construction of the proposed stadium. Its primary allegation was that the Corps' reevaluation violated NEPA's requirement that an EIS be prepared for major federal actions significantly affecting the environment. But also alleged were violations of the Clean Water Act (CWA), 33 U.S.C. Secs. 1344 and 1365; the Fish and Wildlife Coordination Act of 1934 (FWCA), 16 U.S.C. Sec. 662; the Endangered Species Act (ESA), 16 U.S.C. Sec. 1531 et seq.; the Clean Air Act (CAA), 42 U.S.C. Sec. 7506; and regulations promulgated pursuant to each act. In addition, review was sought under the Administrative Procedures Act (APA), 5 U.S.C. Sec. 701 et seq.
 The district court conducted a five-day bench trial, at the conclusion of which it held in favor of the defendants on all claims. Specifically, the district court ruled that the Coalition had failed to meet its threshold burden of proof under NEPA, in that it did not raise a substantial environmental issue based on facts which were omitted from the record of the administrative proceedings. The district court also found that the Corps' decision not to revoke, suspend or modify its permit was not reviewable under the APA but, even if it was, the decision was not arbitrary, capricious or otherwise not in accordance with law. The remaining claims were all found to be without merit and are not at issue here.
 On this appeal the Coalition advances several bases for reversal. At the outset, it maintains that this case is moot and that the decisions below should be vacated because, subsequent to the trial, the St. Louis football franchise moved to Phoenix, Arizona. In the alternative, the Coalition argues that the MFR was an inadequate decisional document upon which the Corps' determination could be upheld; that the district court improperly excluded certain intra-agency communications from its review of the administrative record; that the district court applied the wrong standard of review under NEPA and that the district court erroneously concluded that the Corps had complied with NEPA's procedural requirements. The Coalition also argues that the Section 404 permit, by its own terms, does not permit stadium construction, that it is in violation of a local zoning ordinance and that it is in violation of Missouri's implementation plan for the enforcement of federal air pollution standards.
 I. MOOTNESS
 The Coalition urges us to hold that issues concerning the proposed addition of a domed football stadium to Riverport are moot because the St. Louis Football Cardinals have, since the trial, moved to Phoenix, Arizona. They state that the Corps had relied on representations made by the defendants to the effect that Mr. Bidwill, owner of the Cardinals, was willing to execute a lease for the proposed Riverport Stadium and that private financing was already in place. But, the Coalition argues, because the Cardinals have left St. Louis, the Corps' reevaluation no longer has an impact on anybody who is presently planning, or is in a position to build a Riverport stadium. They reason that, since the likelihood of building a stadium is contingent upon the remote possibilities of attracting investors and a new franchise, and because construction is, at best, years away when relevant circumstances may have changed, the case is moot and the decisions below should be vacated.
 
 
 1
 We disagree with the Coalition's position and hold that this case "fits well within the classic exception to the mootness doctrine for disputes which are 'capable of repetition, yet evading review.' " Thomas v. Bennett, 856 F.2d 1165, 1168 (8th Cir.1988) (citations omitted). In the absence of a class action, the capable of repetition exception applies if "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982); Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975). We are satisfied that both of these conditions have been met.
 
 
 2
 St. Louis County has purchased, and still owns the proposed stadium site. In addition, it represents to this court that it is actively pursuing stadium development for Riverport and is seeking a National Football League expansion franchise to locate there. These representations, standing alone, may not be sufficient to support a finding that there is a present, live controversy between the parties, but when considered in overall context it becomes clear that such a controversy does indeed presently exist. Cf. Cedar-Riverside Environmental Defense Fund v. Hills, 560 F.2d 377 (8th Cir.1977) (but for intervening municipal legislation, promoter's express intent to seek financing and developer's intent to proceed with construction would have been sufficient to present a live controversy).
 
 
 3
 There is more than a reasonable likelihood that the Coalition, or those having identical interests, will pose continuing legal challenges to prevent construction of the proposed stadium. The Coalition does not dispute that it, or those in privity with it, have already challenged the proposed stadium in three separate lawsuits, and that they have organized a "No Dome" committee in opposition to the proposed stadium. Furthermore, the Coalition admits that there is "concerted, unanimous opposition of the business and civic leaders of the St. Louis Community" to construction of a stadium anywhere but in downtown St. Louis.
 
 
 4
 If we were to hold this case moot now, the very real prospect of litigation would hang like a dark cloud over the negotiations between St. Louis County and potential NFL franchisees. The defendants note that the sixteen-month reevaluation and the lengthy district court proceedings have already contributed to the loss of the Cardinals Franchise. By using the threat of protracted litigation, calculated to have the maximum disruptive effect on negotiations, the Coalition would be able to accomplish indirectly what it has not been able to achieve directly in the proceedings below. And it would be able to do so time and again without judicial review because, according to the Coalition's argument, each time it succeeded in scaring off a potential franchise the case would again become moot.
 
 
 5
 Moreover, the Corps' reevaluation was concerned only with the potential environmental effects of a generic, domed stadium. The Corps' decision that a domed stadium would have no impact on the environment materially different from the proposed industrial park did not depend on the Cardinals or any other specific team inhabiting that stadium. The Corps has ruled that its 1985 permit does not foreclose construction of a stadium; the defendants intend to build a stadium and the Coalition intends to oppose it. The Cardinals' departure does not alter this set of circumstances, and it does not moot this case. There is, accordingly, a present, live controversy before us. E.g., Thomas v. Bennett, supra; Clark v. Brewer, 776 F.2d 226 (8th Cir.1985); In re Martin, 761 F.2d 472 (8th Cir.1985); Terry v. Penn Central Corp., 668 F.2d 188 (3rd Cir.1981).
 
 II. NEPA
 A. The Administrative Record
 
 6
 The Coalition argues that the administrative "record" on which we must base our review is the MFR issued by the District Engineer to record the results of his evaluation. And, because the MFR does not contain a "convincing statement of reasons why potential environmental effects are insignificant," the Corps' decision not to prepare an EIS must be found to be unreasonable. As a corollary to that argument, the coalition complains also that the district court erred in allowing testimony to "explain" the MFR because it was tantamount to post-hoc rationalization which defeats NEPA's purpose of insuring informed, well-considered environmental decisions before the fact. These arguments are easily rejected.
 
 
 7
 Both of the Coalition's arguments are premised upon the false assumption that our judicial review is limited to an examination of the six-page MFR. However, the question before us is not, as the Coalition urges, whether the MFR contains the requisite convincing reasons to stand on its own, but whether, under the appropriate standard of review, the determinative finding in the MFR is sustainable on the administrative record made. Camp v. Pitts, 411 U.S. 138, 142-43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). And that record includes the MFR, the EA and the full ten volumes of documents compiled during the Corps' reevaluation process.
 
 
 8
 In attempting to sort out and wade through the voluminous administrative record, it was not an abuse of the district court's discretion to allow testimony of an explanatory nature. Sierra Club v. U.S. Army Corps of Engineers, 771 F.2d 409, 413 (8th Cir.1985) (citations omitted). The district court did not attempt to try the administrative proceedings de novo, but properly confined its inquiry to the question of whether the Corps' decision was reasonable, based upon the administrative record. See 678 F.Supp at 800 (The question is whether a reasonable person could reach the same result the Corps reached on the same evidence.) (emphasis added). Since the district court did not create a "new record" on which to base its findings, we find no error. Sierra Club, supra.
 
 
 9
 With respect to the state of the record, the Coalition argues that the district court erroneously denied its motion to compel the Corps to produce requested documents. The documents in question concern certain intra-agency recommendations and preliminary decisions made by agency personnel in connection with the Corps' 1985 decision that an EIS need not be prepared. But because the propriety of the original permit was not before the district court, we find no abuse of discretion in denying the Coalition's discovery motion.
 
 
 10
 The Coalition presented its challenge to the original permit in an earlier lawsuit referred to herein as Riverport I. See 678 F.Supp. at 796. In that case the Coalition's claims regarding the domed stadium were dismissed without prejudice because the Corps had not yet completed its reevaluation. However, "all claims" against the original permit were dismissed with prejudice pursuant to a consent decree signed by the parties and approved by the court.[8] As a result, the Coalition is barred by principles of res judicata from asserting claims related to issuance of the original Riverport permit. See Brooks v. Barbour Energy Corp., 804 F.2d 1144 (10th Cir.1986) (settlement agreement approved by court with prejudice is res judicata to later lawsuit based on same occurrence). The documents the Coalition would have included in the record did not concern the question considered by the Corps on reevaluation--whether there would be a significant increase in the scope of the permitted activity--but rather concerned the wisdom of the Corps' initial decision to issue a permit. It was well within the district court's discretion to refuse to compel their production.
 
 B. Standard of Review
 
 11
 NEPA requires preparation of an EIS only if the responsible federal agency determines in the first instance that a "major federal action" will "significantly affect the quality of the human environment." 42 U.S.C. Sec. 4332(2)(C); Ringsred v. Duluth, 828 F.2d 1305, 1307 (8th Cir.1987); Olmstead Citizens for a Better Community v. United States, 793 F.2d 201, 204 (8th Cir.1986). The Corps presumed in this case that issuance of a Section 404 permit was a major federal action.[9] 678 F.Supp. at 799. But it determined from its original evaluation and EA that granting the Section 404 permit for the originally proposed Riverport project would not have a significant effect on the quality of the human environment. And, on reevaluation, the Corps concluded that the addition of a domed stadium to Riverport would not alter that determination since the addition would not have an environmental impact materially different from the originally proposed commercial-industrial-retail park. Accordingly, an EIS was never prepared and the Corps decided that the addition of a stadium did not require the original permit to be revoked, suspended or modified.[10] The Coalition takes exception to these decisions and argues that NEPA required preparation of an EIS under the facts of this case.
 
 
 12
 The standard under which we review an agency's decision that preparation of an EIS is not required by NEPA is well settled. The initial burden of proof is upon the challenging party to demonstrate that there were facts omitted from the administrative record which, if true, would show that the permitted project could have a substantial impact on the environment. Ringsred v. Duluth, supra at 1307; Olmstead Citizens for a Better Community, supra at 204; Winnebago Tribe of Nebraska v. Ray, 621 F.2d 269, 271 (8th Cir.), cert. denied, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980); Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314 (8th Cir.1974) (en banc). If such facts are established, and they are of sufficient significance to warrant shifting the burden of proof, the agency must then demonstrate that its negative determination was reasonable under the circumstances. Id. The test is one of reasonableness--not whether the agency's determination was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Minnesota Public Interest Research Group, supra at 1320.
 
 
 13
 NEPA is an essentially procedural act designed to insure that the responsible federal agencies make fully informed and well-considered environmental decisions. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978); Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1979). It does not require that agencies reach decisions that we, as judges, would have reached had we been members of the decision-making unit of the agency. Id. Rather, the court's only role is to insure that the agency has considered the environmental consequences before taking action. Strycker's Bay, supra 444 U.S. at 227, 100 S.Ct. at 499; Kleppe v. Sierra Club, 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976). Thus, if the challenging party is unable to meet its initial burden of proof--to demonstrate that the agency failed to consider facts which, if true, would show that the permitted project could have a substantial effect on the environment--we need not reach the question of whether the agency's decision not to prepare an EIS was reasonable.
 
 
 14
 The record demonstrates that the Coalition failed to sustain its burden. The sheer volume of the administrative record in this case is evidence that the Corps gave environmental effects the type of consideration required under NEPA. Baltimore Gas & Electric Co. v. NRDC, Inc., 462 U.S. 87, 98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). But of more importance is what the record shows. The Corps considered twenty-eight different environmental and other impacts potentially associated with the proposed stadium. 678 F.Supp. at 801. This consideration took into account the views of the Coalition and its experts, private organizations, the Environmental Protection Agency, the Fish and Wildlife Service, the Emergency Management Agency, the National Park Service, the Missouri Department of National Resources, the Missouri Department of Commerce, the Missouri Highway Traffic Commission, the Missouri Attorney General's Office and the officials of surrounding municipalities. In all, the Corps reviewed twenty-two depositions, thousands of documents and held what amounted to a "seven-month public hearing." 678 F.Supp. at 796-97.
 
 
 15
 On the surface the Coalition appears to argue that the Corps did not fully consider traffic and safety impacts, air pollution, surface runoff, cumultive impacts of related developments, controversial effects, alternatives to the Riverport site and economic impacts. On closer examination, however, these arguments actually take issue with the "correctness" of the Corps conclusions, not with the procedural adequacy of the Corps' consideration. See Olmstead Citizens for a Better Community v. United States, 793 F.2d 201, 207, n. 8 (8th Cir.1986) (the question is whether an agency "considered" environmental effects, not the "correctness" of the decision). The record is replete with evidence that each of these issues was before the Corps. As to most of the issues raised, there was testimony from not only the Coalition's own experts but from neutral government agencies. In any event, the record does not support the assertion that the Corps failed to fully consider these impacts. Because the Coalition has failed to meet its threshold burden in this regard, we need not address the matter further.
 
 III. LAWFULNESS OF STADIUM PROPOSAL
 
 16
 The last argument advanced by the Coalition on this appeal is that the stadium proposal is unlawful in three respects. First, the Coalition claims that the proposed stadium exceeds the activities authorized by the Section 404 permit which allows filling of wetlands incident to construction of an "industrial park." We agree with the defendants' contention that this argument is frivolous. The activity permitted by the Corps is not the construction of an industrial park or a stadium; it is the filling of wetlands necessary to construct an 800-foot section of the levee. The substitution of a stadium for some unspecified industrial facility does not change the scope of that activity. Moreover, the original EA contemplated that "entertainment facilities" would be a part of Riverport. Clearly, a football stadium is an entertainment facility.
 
 
 17
 Second, the Coalition argues that the proposed stadium is prohibited by a local zoning ordinance. But the Coalition does not allege that deviation from the local ordinance will necessarily affect the "quality of the human environment." Olmstead Citizens for a Better Community v. United States, 793 F.2d 201, 207 (8th Cir.1986). "In other words, to the degree that a given zoning ordinance reflects social and economic, rather than ecological, considerations, uses contrary to the ordinance do not implicate the concerns underlying NEPA." Id. Because the Coalition does not allege that the zoning ordinance is premised on ecological considerations, it has not stated a claim cognizable under NEPA. And because the Section 404 permit expressly provides that it "does not obviate the requirement to obtain state or local assent required by law," the alleged zoning violation has no relevance to our decision.
 
 
 18
 Finally, the Coalition claims that the proposed stadium violates the air pollution standards set forth in the Missouri State Implementation Plan for Ozone (SIP). See Environmental Protection Agency Regulations at 40 C.F.R. Sec. 51.18(a) (1986). This argument is without merit. The Corps specifically asked the Environmental Protection Agency (EPA), which is charged with the responsibility for implementing the Clean Air Act, 42 U.S.C. Sec. 7401, et seq., whether automobile emissions associated with the proposed stadium were regulated by the Missouri SIP. The EPA responded in the negative. Moreover, the state agency which implements the SIP raised no objections related to air pollution even though it expressed concern with respect to five other environmental issues. We find under these circumstances that the Coalition has shown no violation of NEPA or the Clean Air Act.
 
 
 19
 Accordingly, the judgment of the district court is affirmed.
 
 
 20
 FAGG, Circuit Judge, dissenting.
 
 
 21
 I believe the dispute we are called on to decide in this case has become moot.
 
 
 22
 The United States Army Corps of Engineers (the Corps) determined that altering the Riverport project plans to include a domed stadium did not require the Corps to change its earlier permit allowing St. Louis County to develop the project without an environmental impact statement. The court suggests the Corps' decision "was concerned only with the potential environmental effects of a generic, domed stadium [and] * * * did not depend on the Cardinals or any other specific team inhabiting that stadium." Ante at 1030. I disagree.
 
 
 23
 The Corps' Riverport permit decision was triggered by the presence and real commitment of the St. Louis Cardinals football team. With the relocation of the football Cardinals while this appeal was pending, and with no replacement football team on the horizon, the factual predicate for the Corps' administrative decision no longer exists. Due to this change in the essential nature of the dispute that precipitated the Corps' challenged action, I believe the appeal before us presents a purely abstract question and not a live case or controversy.
 
 
 24
 I also disagree with the court's assessment that the circumstances of this case fit within the exception to the mootness doctrine for controversies that are " ' "capable of repetition, yet evad[e] review." ' " Ante at 1029 (quoted citations omitted). I have no quarrel with the idea that this controversy may resurface in the years to come. Even so, I see nothing about the process for obtaining the Corps' decision (one way or the other) on the environmental impact statement that makes the process so transient that its "short duration" will inherently escape judicial review. See Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam). On the contrary, if the county attracts another professional football team to occupy a domed stadium within the original Riverport project, there will be ample opportunity for the parties to seek review of an administrative decision that will then be based on current facts and circumstances.
 
 
 25
 To allow review now on a theory that "a football team is a football team is a football team" in my view ignores the true character of this facet of the project as it was submitted to the Corps--that a professional football franchise was then ready and financially prepared to occupy the stadium under specific conditions. I am not willing at this point to presume those conditions had no effect on the Corps' permit decision or that different variables some time from now likewise will have no impact on future Corps permit determinations.
 
 
 26
 In sum, the football Cardinals are out of the Riverport project picture, and there is no understudy "anchor tenant" waiting in the wings. Obtaining a replacement team that is willing to commit itself to a domed stadium within the Riverport project is currently a matter of conjecture at best, see SEC v. Medical Comm. for Human Rights, 404 U.S. 403, 406, 92 S.Ct. 577, 579, 30 L.Ed.2d 560 (1972). The key reason for considering a variance from the Corps' original permit has disappeared. Consequently, the specific dispute that was put before the Corps by the supporters and opponents of a domed stadium is now moot. This being so, I would remand the case to the district court for an order directing the Corps to vacate its challenged permit decision. See A.L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 329, 331, 82 S.Ct. 337, 340, 341, 7 L.Ed.2d 317 (1961); Hollister Ranch Owners' Ass'n v. FERC, 759 F.2d 898, 901-02 (D.C.Cir.1985).
 
 
 
 *
 The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas, sitting by designation
 
 
 [1]
 The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 Section 404 of the Clean Water Act of 1977, 33 U.S.C. Sec. 1344, forbids discharge of dredged or fill materials into "navigable waters"--defined as "waters of the United States"--unless authorized by the Army Corps of Engineers. Fresh water "wetlands" are within this definition and thus are subject to the Corps' jurisdiction. United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); 33 C.F.R. Sec. 323.2(a) (1987) and 33 C.F.R. Sec. 328.3(b) (1987)
 
 
 [3]
 An EA is a brief document which addresses the question whether a project subject to a permit requirement could have significant effects on the environment. The EA must conclude either with a determination that an Environmental Impact Statement is required, or with a finding of no significant impact (FONSI). 33 C.F.R. Part 230, Appendix B, Sec. 8(a) (1987)
 
 
 [4]
 See Section 102(2)(C) of NEPA, 42 U.S.C. Sec. 4332(2)(C), which requires all agencies of the federal government to include in every recommendation or report on proposals for "major federal actions significantly affecting the quality of the human environment" a detailed Environmental Impact Statement
 
 
 [5]
 33 C.F.R. Sec. 325.7 (1987) permits the district engineer to reevaluate the "circumstances and conditions of any permit" and "initiate action to modify, suspend or revoke a permit as may be made necessary by considerations of the public interest."
 
 
 [6]
 See 33 C.F.R. Sec. 325.7(a) (1987) (significant increases in scope of permitted activity will be processed as new applications)
 
 
 [7]
 See supra, n. 5
 
 
 [8]
 The relevant portion of the consent decree provides:
 When the Corps makes its final determination on the reevaluation, this Consent Decree and Judgment shall not be deemed to bar any future litigation concerning the Corps' determination with respect to the domed sports stadium or related parking lots outside the Riverport levee.
 Plaintiffs' rights to assert all claims and allegations concerning the stadium and related parking lots outside the Riverport levee are preserved, however, allegations and claims directed to both Riverport (the original permit, including the modification thereto as provided in Paragraph 7 herein) and the stadium shall be preserved only to the extent directed to the stadium and related parking lots outside the Riverport levee.
 ....
 Except as provided ... above, all claims asserted in plaintiffs' complaint ... are hereby dismissed with prejudice.
 
 
 [9]
 See 40 C.F.R. Sec. 1508.18(b)(4) (1987), Regulations of the Council on Environmental Quality, which includes projects "approved by permit" within the definition of "Major Federal Action."
 
 
 [10]
 We agree with the district court that a decision not to modify, suspend or revoke a Section 404 permit is one committed to the Corps' absolute discretion and, as such, it is not reviewable under the Administrative Procedures Act, 5 U.S.C. Sec. 701(a)(1), (2). Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (decision not to enforce is generally committed to agency's absolute discretion and is presumptively unreviewable under APA); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (discretionary decisions unreviewable where statute so broad that in a given case there is no law to apply). In reaching this conclusion we find, as did the district court, that neither the Corps' regulations nor the Clean Water Act mandate issuance of a permit or the reevaluation of same. See Harmon Cove Condominium Ass'n, Inc. v. Marsh, 815 F.2d 949 (3rd Cir.1987) (Sec. 404 of CWA and 33 C.F.R. Sec. 325.7 promulgated thereunder authorize discretionary Corps action). Cf. Dubois v. Thomas, 820 F.2d 943 (8th Cir.1987) (Sec. 505(a)(2) of CWA); Woodsmall v. Lyng, 816 F.2d 1241 (8th Cir.1987) (Sec. 501, et seq. of Housing Act of 1949); Hill v. Group Three Development Corp., 799 F.2d 385 (8th Cir.1986) (Sec. 8 of Housing Act of 1937)